UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


SAGINAW HOUSING COMMISSION et al.,

       Plaintiffs,

                                Case Number 08-12148
v.                                    Honorable Thomas L. Ludington

BANNUM, INC.,

       Defendant.

_____ /


**OPINION AND ORDER GRANTING DEFENDANTS' MOTION
TO DISMISS AND GRANTING PLAINTIFFS' MOTION TO DISMISS**

This land use dispute arises out of the operation of a federal halfway house in Saginaw, Michigan, built in 2008 and in operation since. While the halfway house was under construction, Plaintiff Saginaw Housing Commission sought an injunction in state court to prevent Defendant Bannum, Inc., from completing or operating the facility. Arguing that the proposed use violated Saginaw's zoning ordinance, the housing commission sought a temporary restraining order from the Saginaw Circuit Court. The restraining order was temporarily granted, only to be dissolved at the hearing five days later. Bannum then removed the case to this Court and counterclaimed. Shortly thereafter, the city issued a certificate of occupancy and Bannum began operating the halfway house. The housing commission did not challenge the issuance of the certificate of occupancy (just as it had not challenged the planning commission's approval of the proposed use of the property). Instead, it moved for this Court to abstain from exercising jurisdiction. The Court concluded that abstention was appropriate. The Sixth Circuit reversed, returning the case to this Court.

Bannum now moves to dismiss the complaint, arguing that the claims are barred because the housing commission did not exhaust its administrative remedies.  ECF No. 56.  The housing commission moves to dismiss Bannum's counterclaims.  ECF No. 59.  For the following reasons, the Court will grant both parties' motions.

I

In 2007, the United States Bureau of Prisons solicited bids for the construction and operation of a federal "residential reentry center" (commonly referred to as a halfway house) in Saginaw, Michigan.  These centers provide living accommodations to prison inmates nearing release from custody and criminal defendants sentenced to serve a period of time at such a facility.  Typically, a resident remains at the center for about four months.  Continually monitored by staff, the residents are not prevented from departing the premises without permission.  Instead, staff members simply notify law enforcement of the unauthorized departures.  The five year contract for the Saginaw facility was scheduled to commence in 2008, conclude in 2013, and was worth more than $4 million.

Bannum, a Kentucky corporation that operates federal halfway houses in several states, prepared a bid.  On March 12, 2007, Bannum wrote to the City of Saginaw Zoning Coordinator, John Stemple, and requested information regarding zoning districts in which the center could be located "by right."  Bannum also asked for information about obtaining approval from the planning commission.  Stemple responded, informing Bannum that the facility would be "permitted as a special land use after approval by the Planning Commission in an M-1 Light Industrial Zoning District and [would be] permitted by right in the M-2 General Industrial Zoning District."  Def.'s Answer & Countercl. ¶ 48, ECF No. 3.  He also informed Bannum that

-2-

he was "aware of some vacant property that is zoned M-2 if [Bannum was] considering new construction for [its] facility and would be happy to put [Bannum's] real estate agent in contact with the owner of this property." *Id*. Stemple then identified a parcel of land located at 2209 Norman Street in Saginaw. The parcel is zoned M-2, a "general industrial district."

In August 2007, Bannum purchased the parcel and began preparing a "site plan review" that detailed the proposed use. On October 5, 2007, Stemple again wrote to Bannum. "[T]he position of the City of Saginaw," he explained, "[is] that your proposed use is one that is permitted by right and would require no special approvals by the City Planning Commission nor the City Counsel." Def.'s Mot. to Dismiss Ex. 1, ECF No. 56 ("Def.'s Mot."). He elaborated:

> The property is located in the M-2 General Industrial District which states that all permitted uses and permitted uses after special approval in an M-1 District are permitted uses in the M-2 District. Correctional facilities are listed as permitted use after special approval in the M-1 therefore this use would be a permitted use in the M-2 District. We do acknowledge that our zoning ordinance is conflicting in that it also lists correctional facilities as permitted use after special approval in the M-2 District. I have reviewed this with our City Attorney and it is still our contention that your proposed use is one that is permitted by right.

*Id*.

Bannum submitted its site plan review to the city planning commission, requesting formal approval of the proposed use.

At a public meeting on October 23, 2007, the commission took up the issue. By a vote of 7–0, the commission approved the plan and issued an order memorializing its decision. Def.'s Mot. Ex. 2.[1]

---

[1] As an aside, it should be noted that even if the housing commission had been actually unaware of the planning commission's meeting and decision — an assertion it does not expressly advance in its papers — because the meeting was conducted in compliance with Michigan's Open Meetings Act, the housing commission would be charged with constructive notice. *See* Mich. Comp. Laws § 125.3701 (providing that site plan review must take place at a public meeting "conducted in compliance with the open meetings act"); *Mayor of Lansing v. Knights of the Ku Klux Klan*, 564 N.W.2d 177, 179 n.1 (Mich. Ct. App. 1997) ("The commission conducts its business subject

Under the order's "findings of fact," two findings are noted: "permitted use – code" and "no opposition present." *Id*. The order further provides "Any appeal of this decision must be brought to the Circuit Court within 30 days of the date of this order." *Id*.

The bureau of prisons awarded the contract to Bannum in March 2008. The next month, the city issued a building permit to Bannum. Construction commenced.

On May 7, 2008, the Saginaw Housing Commission and three hundred unnamed plaintiffs filed a complaint for temporary and permanent injunctive relief in the Saginaw Circuit Court. The housing commission is a municipal corporation created to own, manage, and maintain low income housing in Saginaw. Primarily funded by the U.S. Department of Housing and Urban Development, the housing commission also owns an eleven acre parcel of real property across the street from Bannum's property. This parcel is slated for future development as a residential neighborhood.

Attached to the housing commission's complaint and motion for a temporary restraining order was an affidavit of Duane Walker, the former executive director of the housing commission. In the affidavit, the gentleman asserts that "construction of the facility is impermissible under the zoning ordinances of the City of Saginaw." Def.'s Notice of Removal 9, ECF No. 1. On May 8, 2008, the circuit court granted the request for a temporary restraining order. On May 12, 2008, the court held a hearing and lifted the restraining order.

Three days later, the Saginaw City School District filed suit against Bannum and the City of Saginaw in the Saginaw Circuit Court, similarly seeking to enjoin the construction and

---

to the Open Meetings Act . . . . Hence, we assume plaintiffs had constructive, if not actual, notice." (internal citations omitted)).

operation of the halfway house.  The nearest school is about seven hundred and fifty feet from Bannum's property.

The following day, May 16, 2008, Bannum removed both cases to this Court based on diversity of citizenship.  Contending that the City of Saginaw had been fraudulently joined as a party, Bannum argued that the city should be disregarded for purposes of diversity.  The following week, Bannum answered both complaints and raised counterclaims alleging abuse of process, interference with contract, violation of 42 U.S.C. § 1983, and ultra vires acts.

Both the housing commission and the school district moved to return the matter to state court.  The school district moved to remand the case.  The housing commission moved for this Court to abstain from exercising jurisdiction.  Bannum and the city, in turn, moved to dismiss both complaints.  Because of the common issues, a consolidated hearing was held.  Following the hearing, the Court issued an opinion and order concluding that the city was properly joined in the school district's complaint, defeating diversity jurisdiction, and that abstention was appropriate with regard to the housing commission's complaint.  ECF No. 23. Accordingly, the school district's motion to remand was granted, as was the housing commission's motion to abstain, and Bannum and the city's motions to dismiss were denied without prejudice.

On July 17, 2008, the Chief Inspector of the City of Saginaw issued a certificate of occupancy for the property to Bannum for operation of the center.  Bannum later began operating the center, and has maintained operations since.

In August 2008, Bannum moved for reconsideration of this Court's order. The motion was denied.  *Saginaw Housing Comm'n v. Bannum Inc*., No. 08-12148-BC, 2008 WL 3843541

(E.D. Mich. Aug 14, 2008), *rev'd* 576 F.3d 620, 629 (6th Cir. 2009). Bannum appealed to the Sixth Circuit.

In 2009, the Sixth Circuit reversed in part. *Saginaw Housing Comm'n v. Bannum, Inc*., 576 F.3d 620, 629 (6th Cir. 2009). Writing for the panel, Judge McKeague noted, "The question in this appeal is one of first impression in this circuit: whether a federal court should abstain from a decision involving the interpretation of a local land use ordinance." *Id*. at 626. Answering in the negative, the court drew a distinction between state governments, for whom abstention is merited because of their "rightful independence," and municipal governments, which "have no such independence." *Id*. Reversing the grant of the motion to abstain, the court wrote: "[W]e hold that *Burford* abstention applies only to statewide policies and that the appropriate focus for *Burford* abstention is state policy, rather than local policy." *Id*. at 628. The housing commission's case was thus remanded to this Court (the Sixth Circuit concluded that this Court's order remanding the school district's case for lack of subject matter jurisdiction was unreviewable).

In March 2010, the housing commission sought concurrence for a stipulated order dismissing its complaint and Bannum's counterclaims with prejudice. *See* ECF No. 44. Bannum refused as it was unwilling to dismiss its counterclaims.

More than a year and a half passed, during which numerous efforts were made to reach a consensual solution. These efforts were not successful. In October 2011, Bannum moved to dismiss the complaint, contending that the claims are time-barred and that the housing commission lacks standing. The following month, the housing commission moved to dismiss the

counterclaims, contending that they do not state claims on which relief can be granted. Both motions are now pending. Each is addressed in turn.

## II

As a preliminary matter, although both motions are nominally motions to dismiss, in substance both are summary judgment motions. For example, although the housing commission's motion is titled as a "motion to dismiss," the motion cites Federal Rule of Civil Procedure 56, not Rule 12. Moreover, the housing commission answered the counterclaims in June 2008. ECF No. 9. It filed its motion to dismiss in November 2011. A motion to dismiss for "failure to state a claim on which relief can be granted," of course, "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). Thus, a motion to dismiss for failure to state a claim pursuant to 12(b)(6) would be more than three years late.

Likewise, Bannum answered the complaint in May 2008. ECF No. 3. It filed its motion to dismiss in October 2011, more than three years later. Additionally, Bannum attaches exhibits outside the pleadings to its motion. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). Accordingly, each motion is treated as a motion for summary judgment.

A motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## III

Bannum moves for judgment on two grounds, timeliness and standing. The timeliness argument, in turn, divides into two sub-arguments. First, Bannum contends, the housing commission's suit is time-barred because it has not appealed the October 2007 order of the city planning commission, much less appealed it within thirty days of the order. Second, Bannum contends, the housing commission's suit is again time-barred because it has not appealed the certificate of occupancy issued in July 2008, much less appealed it within sixty days of issuance, as required by the city's zoning ordinance. Because the timeliness argument is dispositive, it is taken up first.

## A

The zoning power of a city in Michigan is regulated by the Michigan Zoning Enabling Act, Mich. Comp. Laws §§ 125.3201–125.3701 ("Act"). In pertinent part, the Act authorizes a city to enact a "zoning ordinance for the regulation of land development and the establishment of 1 or more districts within its zoning jurisdiction which regulate the use of land." § 125.320(1). The City of Saginaw has enacted such an ordinance, the Zoning Code of the City of Saginaw, City of Saginaw, Mi., Code of Ordinances §§ 153.001–153.999 ("Code").

The Code establishes a comprehensive, if not altogether consistent,[2] set of zoning regulations. "Prior to the erection of any building or structure," the Code provides in a broadly worded provision, "or change in use, in any zoning district in the City and any land use requiring special approval or any planned unit development, a site plan shall be submitted for review and approval." *Id*. § 153.073. "The purpose of site plan review," the Code explains, "is to determine compliance with the provisions set forth herein." *Id*. "Such [site plan] applications are public records." John Cameron, Jr., *Michigan Real Property Law* § 19.8 (ICLE 2005).

"Penal and correctional institutions and detention facilities," such as the halfway house at issue in this case, are addressed in several facially irreconcilable Code sections. First, § 153.372 provides that to operate such a facility in the M-1 district, the owner must obtain "special approval" — "the approval of the City Planning Commission in accordance with processing procedures in § 153.597."[3] In the Code's terminology, operation of a halfway house in the M-1 district is not a "principal permitted use" (or a use by right), but a "permitted use after special approval."

Next, § 153.391 provides that "permitted uses after special approval in the M-1 District" are "principal permitted uses" in the M-2 district. If enumerated as a "permitted use with special approval" in the M-1 district, the use is therefore permitted by right in the M-2 district. As the

---

[2] Stemple, for example, wrote in one of his letters to Bannum, "We do acknowledge that our zoning ordinance is conflicting in that it also lists correctional facilities as permitted use after special approval in the M-2 District." He is correct — the text of three sections, §§ 153.372, 153.391, and 153.392, are facially irreconcilable.

[3] Section 153.597 provides that an applicant for the special land use must provide notice to the community "not less than five and not more than fifteen days before the application will be considered." Code § 153.597(D)(1). Specifically, a notice of hearing must be "published in a local newspaper of general circulation in the City" and sent by mail or by personal delivery on any person owning real property within 300 feet of the property in question. *Id*. The notice must, inter alia, "[d]escribe the nature of the special land use request; . . . [s]tate when and where the special land use request will be considered; . . . [and] [i]ndicate that a public hearing on the special land use request may be requested by a property owner or the occupant of a structure located within three hundred (300) feet of the boundary of the property being considered for a special use." *Id*. § 153.597(D)(3).

halfway house is one of the uses permitted with "special approval" in the M-1 district, under this provision it is permitted by right in the M-2 district. This, in fact, was the conclusion that the Saginaw City Attorney reached. It is, however, in considerable tension with the following section, which governs uses in the M-2 district.

Section 153.392 provides that "[p]enal and correctional institutions and detention facilities" are not uses by right in the M-2 district, as a reading of §§ 153.372 and 153.391 suggests, but rather uses requiring "special approval."[4] Code § 153.392(L).

Perhaps foreseeing that such conflicts might arise, the drafters of the Code included a section setting forth "rules of construction," including: "The particular shall control the general." *Id*. § 153.020(A). Section 153.392 specifically addresses penal and correctional institutions in M-2 districts (requiring "special approval"), while § 153.391 addresses them only by general reference to a separate section of the Code. Thus, a strong argument can be made that such a use requires special approval in both the M-1 and M-2 districts, notwithstanding the provisions of § 153.391.

Notwithstanding these provisions, however, the city advised Bannum that Bannum's proposed use was by right in the M-2 district. Following the city's recommendation, Bannum did not seek special approval. Rather, it simply submitted its site plan to the city planning commission pursuant to § 153.073. This section requires that plans include, inter alia, the "[l]ocation of each existing and each proposed structure in the development area [and] the use or uses to be contained therein" and "comply with all requirements of the applicable zoning district." Code §§ 153.073(B)(2)(e)(1), 153.073(B)(2)(i)(7). The section continues: "The site

---

[4] Somewhat surprisingly, this ambiguity is avoided in the provision regarding the M-3 (or "heavy industrial district"), which provides that "permitted uses after special approval in the M-2 District" are "principal permitted uses" in the M-3 district, "except penal and correctional institutions and detention facilities." Code § 153.411(B).

plan shall be reviewed by the City Planning Commission and shall be approved, disapproved, or approved with specific conditions as may be deemed necessary to carry out the purpose of this chapter and other codes and regulations of the City."  *Id.* § 153.073(B)(2)(k).

Significantly, this review must take place at a public meeting "conducted in compliance with the open meetings act," and any "writing" submitted to the planning commission is a public record.  Mich. Comp. Laws § 125.3701.  While the Code confers a measure of discretion on the planning commission, it also circumscribes that discretion by providing for an administrative review process.  *See Sun Cmtys. v. Leroy Twp.*,  617 N.W.2d 42, 45 (Mich. Ct. App. 2000) ("Various actions . . . such as site-plan review . . . are essentially administrative in nature." (citing *Hessee Realty, Inc. v. Ann Arbor*, 232 N.W.2d 695 (Mich. Ct. App. 1975)).

Decisions of the planning commission are appealable to the city's Board of Appeals on Zoning, which "has the power to hear and decide appeals when it is alleged by the appellant that there is an error of law in any order, requirement, permit, decision, determination, or refusal made by the Chief Inspector or any other administrative official in carrying out or enforcing any provision of this chapter."  Code § 153.618.  This is consistent with the Act, which provides:

> The zoning board of appeals shall hear and decide questions that arise in the administration of the zoning ordinance . . . . It shall hear and decide appeals from and review any administrative order, requirement, decision, or determination made by an administrative official or body charged with enforcement of a zoning ordinance adopted under this act.

Mich. Comp. Laws § 125.3603.  "These include site plan review . . . . Hence, exhaustion of administrative remedies may be required in the case of a challenge to the validity of administrative action."  Cameron, *supra*, § 23.28 (citing *Baruk v. Rogovein*, 96 N.W.2d 785 (Mich. 1959); *Hessee Realty, Inc. v. Ann Arbor*, 232 N.W.2d 695 (Mich. Ct. App. 1975)).

-11-

Significantly, the Code continues: "The decision of the Board of Appeals on Zoning shall be final." Code § 153.626(A). Once the board of appeals renders its decision, "a person having an interest affected by this chapter may appeal to the circuit court." *Id*. Again, this is consistent with the Act, which provides: "The decision of the zoning board of appeals shall be final. A party aggrieved by the decision may appeal to the circuit court for the county in which the property is located." Mich. Comp. Laws § 125.3605.

If the planning commission approves the proposed use, and no appeal is taken by an interested party, a construction permit must next be obtained from the city's chief inspector. Code § 153.592 ("It is unlawful for any person to commence . . . construction . . . without first obtaining a permit from the Chief Inspector. No permit shall be issued for the construction, alteration or remodeling of any building or structure until an application has been submitted . . . showing that the construction proposed is in compliance with the provisions of this chapter.").

Once the permit is obtained, construction may commence. "After construction has been completed, the building or structure may not be used or occupied until the appropriate enforcing agency has issued a certificate of use and occupancy. . . . This certificate confirms that the building or structure has been constructed in accordance with the building permit, the code, and other applicable laws and ordinances." Cameron, *supra*, § 19.10 (citing Mich. Comp. Laws § 125.1513); *see generally* Edward H. Ziegler, Jr. et al., *Rathkopf's The Law of Zoning and Planning* § 69:24 (West 2011) ("The certificate of occupancy also states what the use permitted in the structure or on the land may be."). Under the Code,

> It is unlawful to use or permit the use of any land, building or structure for which
> a building permit is required, and to use or permit to be used any building or
> structure altered, extended, erected, repaired or moved, until the Chief Inspector
> has issued a certificate of occupancy stating that the provisions of this chapter

-12-

> [i.e., Chapter 153 of the Saginaw Code of Ordinances, Zoning Regulations] have
> been complied with.

Code § 153.593; *see also* Mich. Comp. Laws § 125.1513 ("A certificate of use and occupancy

shall be issued by the enforcing agency when the work covered by a building permit has been

completed in accordance with the permit, the code and other applicable laws and ordinances.").

Again, the Code establishes an appeals procedure for persons "affected by a decision of

the chief inspector," with § 153.614 providing in pertinent part:

> An appeal may be taken to the Board of Appeals on Zoning by any person, firm,
> or corporation, or by any officer, department, board, or bureau affected by a
> decision of the Chief Inspector concerning this chapter. Such appeals shall be
> taken within sixty (60) days from the decision by filing with the Chief Inspector
> and with the Board a Notice of Appeal specifying the grounds thereof.

Code § 153.614(A).  And again, "The decision of the Board of Appeals on Zoning shall be

final." *Id.* § 153.626(A).

## B

"[A] plaintiff's complaint is not ripe for judicial review," the Michigan Supreme Court

cautions, "until the zoning authority has reached a final decision and the plaintiff has exhausted

every administrative appeal." *Hendee v. Putnam Twp.*, 786 N.W.2d 521, 529 (Mich. 2010)

(citing *Paragon Props. Co. v. City of Novi*, 550 N.W.2d 772 (Mich. 1996)).  Consequently,

challenges regarding how a municipality applied its zoning ordinances to a particular parcel —

"as applied" challenges — are "subject to the rule of finality." *Conlin v. Scio Twp.*, 686 N.W.2d

16, 20 (Mich. Ct. App. 2004) (quoting *Paragon*, 550 N.W.2d 772).  The Michigan Supreme

Court elaborates:

> An as-applied challenge is one in which the complainant alleges that the
> individual landowner suffers from a specific and identifiable injury as a result of
> the township's zoning ordinance or decision. An as-applied challenge is always
> subject to the rule of finality — the requirement that the governing body has made

> a definitive decision such that an identifiable injury can be shown. An as-applied
> challenge is not ripe for judicial review until the complainant can establish that a
> final decision injures a complainant.

*Hendee*, 786 N.W.2d at 529 n.17 (citing *Paragon*, 550 N.W.2d 772). Consequently, "a property

owner or other party adversely affected by the administration of a zoning ordinance must pursue

and exhaust the administrative remedy available to him or her under a zoning ordinance or

statute before resorting to the courts for other relief from the action or decision of zoning

authorities." 101A C.J.S. *Zoning & Land Planning* § 350. Discussing the many sound reasons

for the finality requirement, Chief Justice Burger writes:

> Exhaustion avoids interruption of the administrative process and allows
> application of . . . the broad discretion granted to local entities, such as zoning
> boards. . . . By requiring exhaustion of administrative processes the courts are
> assured of reviewing only final agency decisions arrived at after considered
> judgment. It also permits agencies an opportunity to correct their own mistakes or
> give discretionary relief short of judicial review. Consistent failure by courts to
> mandate utilization of administrative remedies under the growing insistence of
> lawyers demanding broad judicial remedies inevitably undermines administrative
> effectiveness and defeats fundamental public policy by encouraging "end runs"
> around the administrative process.

*Moore v. City of E. Cleveland*, 431 U.S. 494, 524–25 (1977) (Burger, C.J., dissenting); *but see*

*generally* Note, *Deweyan Democracy and the Administrative State*, 125 Harv. L. Rev. 580, 582–

586 (2011) (discussing the "ongoing debate surrounding the democratic legitimacy of the

administrative state").

In this case, the housing commission has not pursued the necessary steps before seeking

judicial relief. Rather, to borrow the chief justice's phrase, it has repeatedly attempted to make

"end runs around the administrative process."

First, at a public hearing in October 2007, the planning commission approved Bannum's

site plan review. The housing commission did not appeal the decision. Explaining its inaction,

-14-

the housing commission writes: "Bannum engaged in a systematic portrayal of the 'Residential Reentry Center' in a manner designed to avoid any special use approval and the stricter site plan review as required under the regulations."  Pl.'s Opp'n Def.'s Mot. Dismiss 9, ECF No. 58 ("Pl.'s Opp'n").  Elaborating, the housing commission notes that because the site plan was not reviewed pursuant to the meeting requirements of § 153.597, "[n]o notices were published or sent to adjacent neighbors regarding the 'use' of the property."  Pl.'s Opp'n 5.

The housing commission is correct that the site plan was not reviewed pursuant to § 153.597.  It was reviewed pursuant to Code § 153.073.  Accordingly, copies of the site plan were submitted to the Chief Inspector.  And as noted, these became public records.  *See* Cameron, *supra*, § 19.8.  At a public meeting held in accordance with Michigan's Open Meetings Act, the planning commission reviewed and approved the site plan.  *See* Code § 153.073(B)(1); Mich. Comp. Laws § 125.3701.

Significantly, the housing commission does not contend that a public hearing was not held on the matter — or, indeed, that it was actually unaware of the planning commission's meeting and decision.  Rather, it asserts that it was

> deprived of its ability to seek a public hearing and meeting [pursuant to Code § 153.597(F)] in order to compel the Planning Commission to make findings of fact regarding the social and economically desirable aspects of the project, its compatibility with the adjacent property, that it would be operated with public health, safety and welfare being protected, and that it will not cause reasonable injury to the value of other properties as well as other factors as set forth in the special approval portion of the ordinance.

*Id*. at 11 (citing Code § 153.597(F)).  That is, while conceding that a public meeting was held, the housing commission implicitly argues that administrative exhaustion is not required because it did not receive the particular type of public meeting it preferred.

-15-

Yet the housing commission cites no authority for its proposition that exhaustion is not required because it disagrees with the planning commission's interpretation of the ambiguity created by Code §§ 153.372, 153.391, and 153.392, in determining which particular type of public meeting to hold.  On inspection, such an argument is inconsistent with the text of the Code and the Act, as well as settled legal principles.

Under the Code, decisions of the planning commission — including its interpretations of how the Act applies to a particular parcel — are not "final."  Rather, they are appealable to the city's board of appeals on zoning, which "has the power to hear and decide appeals when it is alleged by the appellant that there is an error of law in any order."  Code § 153.618; *see id*. § 153.626(A) ("The decision of the Board of Appeals on Zoning shall be final.").  Likewise, the Act provides:

> The zoning board of appeals shall hear and decide questions that arise in the administration of the zoning ordinance . . . . It shall hear and decide appeals from and review any administrative order, requirement, decision, or determination made by an administrative official or body charged with enforcement of a zoning ordinance adopted under this act.

Mich. Comp. Laws § 125.3603; *see id*. § 125.3605 ("The decision of the zoning board of appeals shall be final.").  "These [questions] include site plan review . . . . Hence, exhaustion of administrative remedies may be required in the case of a challenge to the validity of administrative action."  Cameron, *supra*, § 23.28; *see also Conlin v. Scio Twp.*, 686 N.W.2d 16, 20 (Mich. Ct. App. 2004) ("Whether pleaded as a violation of substantive due process, a denial of equal protection, or a taking of property without just compensation, a challenge to the validity of a zoning ordinance as applied, is subject to the rule of finality." (internal alterations and quotation marks omitted)).

The housing commission brings the quintessential "as applied" challenge: it challenges the application of the ordinance, contending that the planning commission misapplied its sections to the parcel at issue. As noted, however, the housing commission did not receive a final decision from the city because it never appealed to the city's final decision-maker, the zoning board of appeals. Accordingly, its challenge to the application of the zoning ordinance is not properly before this Court.

## C

Reinforcing the conclusion that the housing commission did not exhaust its administrative remedies is its similar inaction in response to the issuance of the certificate of occupancy. The housing commission concedes that it was aware of the chief inspector's decision, but argues: "It does not matter whether the Saginaw Housing Commission appealed the administrative ruling regarding the certificate of occupancy." Pl.'s Opp'n 12. It elaborates: "The nature of the action makes the certificate of occupancy irrelevant because the occupancy certificate merely evaluates the systems within the building and whether the component parts have been constructed properly by the contractors." *Id.* The argument, however, is inconsistent with text of the Code and the Act.

Under the Code, the certificate of occupancy certifies "that the provisions of this chapter [i.e., Chapter 153 of the Saginaw Code of Ordinances, Zoning Regulations] have been complied with." Code § 153.593; *see generally* Cameron, *supra*, § 19.10; Ziegler, *supra*, § 69:24 ("The certificate of occupancy also states what the use permitted in the structure or on the land may be."). Nothing in the text of this section suggests that the certificate is limited to merely "the systems within the building and whether the component parts have been constructed properly."

-17-

Rather, by its express terms, it certifies that all provisions of the Code have been complied with. The housing commission offers no authority for its contrary interpretation.

Likewise, under the Act: "A certificate of use and occupancy shall be issued by the enforcing agency when the work covered by a building permit has been completed in accordance with the permit, the code and other applicable laws and ordinances."  Mich. Comp. Laws § 125.1513.  Again, the text does not limit the certification to mechanical systems and the like. Rather, by its express terms, it certifies that all applicable laws have been complied with, including applicable zoning ordinances.

Again, the Code establishes an administrative process — one which the housing commission did not follow.  Section 153.614 provides in pertinent part:

> An appeal may be taken to the Board of Appeals on Zoning by any person, firm, or corporation, or by any officer, department, board, or bureau affected by a decision of the Chief Inspector concerning this chapter.  Such appeals shall be taken within sixty (60) days from the decision by filing with the Chief Inspector and with the Board a Notice of Appeal specifying the grounds thereof.

Code § 153.614(A).  And again, "The decision of the Board of Appeals on Zoning shall be final."  *Id*. § 153.626(A).  Because the housing commission did not receive this final decision, its challenge to the application of the City of Saginaw's zoning ordinance is not properly before this Court.  Accordingly, the housing commission's complaint will be dismissed.

**IV**

The housing commission moves to dismiss Bannum's counterclaims, which allege abuse of process, interference with contract, violation of 42 U.S.C. § 1983, and ultra vires acts.  The arguments regarding each are addressed in turn.

-18-

**A**

Count one of Bannum's counterclaim asserts a claim for abuse of process. This tort has two elements: "(1) an ulterior purpose and (2) an act in the use of process which is improper in the regular prosecution of the proceeding." *Friedman v. Dozorc*, 312 N.W.2d 585, 594 (Mich. 1981) (citing *Spear v. Pendill*, 130 N.W. 343 (Mich. 1911)).

Regarding the first element, an ulterior purpose, the claimant must establish the offender "has used a proper legal procedure for a purpose collateral to the intended use of that procedure." *Bonner v. Chi. Title Ins. Co.*, 487 N.W.2d 807, 812 (Mich. Ct. App. 1992) (citing *Vallance v. Brewbaker*, 411 N.W.2d 808 (Mich. Ct. App. 1987)). Significantly, "the ulterior purpose alleged must be more than harassment, defamation, exposure to excessive litigation costs, or even coercion to discontinue business." *Dalley v. Dykema Gossett*, 788 N.W.2d 679, 695 (Mich. Ct. App. 2010). "The usual case of abuse of process," the *Restatement* explains, "is one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it." *Restatement (Second) of Torts* § 682 cmt. b (1977), cited in *Friedman*, 312 N.W.2d at 594 n.18.

Regarding the second element, the improper use of process, "there must be some corroborating act that demonstrates the ulterior purpose." *Bonner*, 487 N.W.2d at 812 (citing *Vallance*, 411 N.W.2d 808). Elaborating on "the nature of the improper act in the use of the process which must be proved (or alleged)," the Michigan Court of Appeals notes that "[p]erhaps the best explanation" is offered by Dean William Prosser, who observes:

> Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the

-19-

proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club.  There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.

William Prosser, *Torts* § 121 (4th ed. 1978), *quoted in Three Lakes Ass'n v. Whiting*, 255 N.W.2d 686, 691 (Mich. Ct. App. 1977).

In this case, Bannum alleges that the housing commission filed suit "to induce the loss of Bannum's Government contract to further their own pecuniary or propriety interests."  Def.'s Answer & Countercl. ¶ 77, ECF No. 3.  Specifically, Bannum alleges, the housing commission's ulterior motive was "to develop the Bannum property including Unity Park and the adjoining 11 acres that the Commission owns."  *Id.*

The housing commission moves for summary judgment on the abuse of process claim, asserting that Bannum has not established an ulterior motive because "Saginaw Housing already owns real property across the street from Bannum's facility, and Saginaw Housing does not seek any additional real property nor has it sought this parcel."  Pl.'s Mot. Dismiss Countercl. 5, ECF No. 59 ("Pl.'s Mot.").  Bannum responds that the housing commission "admitted its intention is to develop the nearby property, and that Bannum's presence will allegedly have an adverse affect [sic] on its development.  Therefore, [the housing commission's] own . . . responses serve as corroboration of its ulterior purpose."  Def.'s Opp'n Mot. Dismiss Countercl. 6 ("Def.'s Opp'n").  Bannum's argument is unpersuasive.

The housing commission's stated purpose, halting Bannum's operation, is not "ulterior" to the goal of protecting the housing commission's own development.  It is integral.  Of course the housing commission seeks to enjoin Bannum's operation because of its own property interests.  Indeed, if the housing commission had not alleged that Bannum injured these interests

-20-

and sought an injunction for the specific purpose of protecting them, the housing commission would lack standing to bring suit.  Likewise, the housing commission is not bringing suit to coerce Bannum to pay a different debt or to take some other action.  Rather, its goal is to stop Bannum's operation because, the housing commission asserts, the operation is not authorized by the Code and will be detrimental to the welfare of the housing commission's future residents.  As noted, to state a claim for abuse of process, "the ulterior purpose alleged must be more than . . . coercion to discontinue business."  *Dalley*, 788 N.W.2d at 695.

Accordingly, the housing commission is entitled to judgment on Bannum's abuse of process claim.

## B

Count two of Bannum's counterclaim asserts a claim for "interference with contract." From the counterclaim itself, it is not obvious whether Bannum is asserting the tort of interference with contract (as its heading suggests) or interference with an advantageous business relationship or expectancy (as Bannum argues in its opposition brief).   The former tort, interference with contract, has three elements: "(1) a contract, (2) a breach, and (3) instigation of the breach without justification by the defendant."  *Jim-Bob, Inc., v. Mehling*, 443 N.W.2d 451, 462 (Mich. Ct. App. 1989).  The latter tort is broader, as it covers expectancies as well as existing contracts, and has four elements:

> (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) an intentional interference causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy has been disrupted.

*Joba Constr. Co. v. Burns & Roe Inc.*, 329 N.W.2d 760, 770 (Mich. Ct. App. 1982) (citing *Wilkerson v. Carlo*, 300 N.W.2d 658 (Mich. Ct. App. 1980)); *see also Bonelli v. Volkswagen of Am., Inc.*, 421 N.W.2d 213, 220 (Mich. Ct. App. 1988) ("Regarding the tort of interference with an advantageous relationship or expectancy, 'an advantageous contractual relationship is sufficient, but not necessary, to state a cause of action.'" (quoting *Woody v. Tamer*, 405 N.W.2d 213 (Mich. Ct. App. 1987)).

Both torts require the claimant to demonstrate either "the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights of another." *Compare Jim-Bob, Inc.*, 443 N.W.2d at 462 (discussing interference with contract), *with Bonelli*, 421 N.W.2d at 220 (discussing interference with advantageous business relationship).

Bannum sufficiently alleges the existence of a valid business relationship — its government contract with the bureau of prisons. Likewise, Bannum sufficiently alleges a breach. Specifically, "As Bannum's contract is contingent upon maintaining zoning, Bannum's BOP contract was breached while the TRO was in effect." Def.'s Opp'n 9. Although not a paragon of pleading, this assertion is sufficient to create a genuine issue as to whether the contract was in fact breached. *Cf. Edwards v. United States*, 19 Cl. Ct. 663, 673 (1990) (holding that contractor's providing site for post office carried with it the responsibility for determining local zoning requirements), *cited in* John Cibinic, Jr., et al., *Administration of Government Contracts* 258 (4th ed. 2006); 48 C.F.R. 52.236-7 ("The Contractor shall . . . be responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work.").

In contrast, Bannum has not pled, much less established, "the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law alleged." *Jim-Bob, Inc.*, 443 N.W.2d at 462.  In conclusory fashion, Bannum asserts that the housing commission obtained a temporary restraining order through "misleading and fraudulent representations to the Court." Def.'s Opp'n 10.  Bannum does not identify what the specific representations made by the housing commission were.  It is possible, but by no means certain, that Bannum is referring to the affidavit submitted by the former executive director of the housing commission, Mr. Walker, in which he asserts, inter alia, that "construction of the facility is impermissible under the zoning ordinances of the City of Saginaw."  Contrary to Bannum's argument elsewhere in its brief, however, this is a legal argument, not a factual misrepresentation.  *See* Def.'s Opp'n 12 (arguing in support of its § 1983 claim that Mr. Walker "falsely alleged that the facility was impermissible under the zoning ordinances").  That is, Mr. Walker is not misrepresenting a fact, as he would have if he had alleged, for example, that Bannum started construction without obtaining any authorization from the city. Rather, he is making a legal argument based on his interpretation of the zoning ordinance.

Likewise, elsewhere in its brief Bannum asserts that Mr. Walker made "material misrepresentations" in his affidavit because he did not disclose that the construction had been approved by the planning commission.  But Bannum does not specify why Mr. Walker had a duty to disclose this decision.  *Cf. Estate of Washington v. United States*, 53 F.3d 1173, 1175 (10th Cir. 1995) (discussing the sources of "a lawyer's duty to disclose adverse controlling authority").  Absent a duty to disclose, silence is not a misrepresentation.  *See generally Univ. of Pittsburg v. Townsend*, 542 F.3d 513, 526 (6th Cir. 2008) ("[M]ere silence suffices as fraudulent

-23-

concealment only when there is a requisite duty to disclose." (applying Pennsylvania law)); *U.S. Fid. & Guar. Co. v. Black*, 313 N.W.2d 77, 88 (Mich. 1981) ("In order for the suppression of information to constitute silent fraud there must be a legal or equitable duty of disclosure. (citing 37 Am. Jur. 2d, *Fraud and Deceit* § 146)).

Accordingly, the housing commission is entitled to judgment on Bannum's interference with contract (and advantageous business relationship) claim.

## C

Count three of Bannum's counterclaim asserts a § 1983 claim for "violation of its due process rights, property interests, and equal protection under the color of the law."   Def.'s Answer & Countercl. ¶ 91.  Specifically, Bannum contends that when the housing commission obtained the restraining order and then organized public protests of the construction, it acted "with the intention of depriving Bannum of its property and contract interests under its Government contract, and with the intention of depriving Bannum of the equal protection of the laws and due process of law." *Id*. ¶ 93.

Section 1983 provides in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."  42 U.S.C. § 1983.  As a general matter,  a claim under § 1983 has two elements: "(1) the violation of a right secured by the federal Constitution or federal law (2) that was committed by a person acting under color of state law."  *Brown v. Matauszak*, 415 F. App'x 608, 611 (6th Cir. 2011) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

-24-

The housing commission, a municipal corporation, concedes that it acts under color of state law.  It disputes, however, that it deprived Bannum of any federal constitutional rights.  In support, the housing commission quotes the Michigan Court of Appeals decision in *Mayor of Lansing v. Knights of the Ku Klux Klan*, 564 N.W.2d 177 (1977), in which the court wrote that "the general rule is that if an injunction issues erroneously, any resulting irreparable injury is not redressable because the error was an act of the court, not of the party who sought the injunction." *Id*. at 180, *quoted in* Pl.'s Mot. 9.  Bannum responds that this general rule does not apply when "a party supplies false or misleading information to the subsequent decision-maker."  Pl.'s Opp'n 12.  Although Bannum correctly articulates an exception to the general rule, it does not establish that the exception applies in this case.

One exception to the general rule is indeed "when judicial decisions are made on the basis of ex parte proceedings." *Mayor of Lansing*, 564 N.W.2d at 183.  The Michigan Court of Appeals writes:

> This exception applies when the party seeking an injunction engages in misconduct that taints the process such that the court's decision cannot be separated from the party's misconduct. . . . A merger of a party's actions with judicial action is . . . sometimes implicated when judicial decisions are made on the basis of ex parte proceedings.  Ex parte proceedings allow a party to present a single version of the facts and applicable law without an opportunity for an opposing party to contest these representations.

*Id*. (internal citations omitted).  This exception is sensible.  As a general matter, "a rule that transforms judicial error into a basis for tort liability by an adversely affected litigant would chill legitimate access to courts."  *Id*. at 181, *quoted in* Pl.'s Mot. 9.  In adversarial proceedings, "the court — or more properly the law itself — rather than the party seeking an injunction, is responsible for a wrongly issued injunction."  *Mayor of Lansing*, 564 N.W.2d at 182.  Thus, the

-25-

court, not the adversary, is the proximate cause of the purported harm.   In an ex parte proceeding, in contrast, a party's assertions are not challenged by an adversary.   Consequently, the court is dependent on one party's version of the facts.   And when these facts are misrepresentations, the party, not the court, is the proximate cause of the harm.

In this case, Bannum identifies three purported misrepresentations.   The first two have been discussed in the previous section — "that Mr. Walker, in his affidavit supporting the TRO, falsely alleged that the facility was impermissible under the zoning ordinances, and failed to disclose that Bannum's project had already been found to be a permitted use as of right by the Saginaw City Planning Commission."   Pl.'s Opp'n 12.   As discussed above, the former assertion is a legal argument, not a factual misrepresentation.   And although latter omission is, perhaps, not a shining example of candor to the tribunal, Bannum cites no authority suggesting that the housing commission had a duty to disclose the planning commission's decision in its motion. The third alleged misrepresentation is another purported tortious omission: the housing commission "misled the Court by failing to disclose that it failed to timely appeal the Order of the Saginaw City Planning Commission."   Id. at 12–13.   Again, however, Bannum does not explain what the source of the duty to disclose is, if any.   Absent such a duty, silence is not a misrepresentation.   *U.S. Fid. & Guar. Co. v. Black*, 313 N.W.2d 77, 88 (Mich. 1981).

Accordingly, the housing commission is entitled to judgment on Bannum's § 1983 claim.

## D

Count four of Bannum's counterclaim asserts a claim of "invalid ultra vires act." Bannum alleges that the housing commission "is vested by statute with certain limited powers directly related to the provision of low income housing services to the residents of the City of

Saginaw." Def.'s Answer & Countercl. ¶ 100. Bannum contends that the housing commission's activities are ultra vires because "its actions are not in the furtherance of providing proper housing or to eliminate conditions detrimental to the safety, morals, and welfare of the public, it is bringing suit because Bannum's facility allegedly affects [the housing commission's] own interests." Pl.'s Opp'n 14. Bannum's argument is unpersuasive.

To begin, alleging an "ultra vires act" is not an independent cause of action in Michigan, but rather a sword to pierce the shield of governmental immunity. In *Ross v. Consumers Power Co*., 363 N.W.2d 641 (Mich. 1984), the Michigan Supreme Court explained:

> In our organized society, people, through the state constitution they have ratified and the laws enacted by representatives they have elected, require or authorize their government to perform certain activities in their behalf. People allow government to handle these matters for a variety of reasons. . . . Regardless of the reason, however, the fact that the people have delegated these responsibilities to government indicates their belief that a particular activity or function is one which the government must or can undertake to meet their individual and collective needs. . . .
>
> Conversely, activities which are not mandated or authorized by the people cannot be deemed governmental. When a governmental agency engages in such activities, it is acting for itself, rather than on behalf of the people. In these situations, the agency should be treated the same as a private tortfeasor.
>
> . . . When a governmental agency engages in mandated or authorized activities, it is immune from tort liability . . . . Whenever a governmental agency engages in an activity which is not expressly or impliedly mandated or authorized by constitution, statute, or other law ( i.e., an ultra vires activity), it is not engaging in the exercise or discharge of a governmental function. The agency is therefore liable for any injuries or damages incurred as a result of its tortious conduct.

Id. at 661. Likewise, for more than a century the law has been settled in Michigan that "[m]unicipal corporations possess only those powers which are expressly conferred or necessarily implied, in consequence of their being essential to the exercise of their proper

functions." *Stebbins v. Judge of Superior Court of Grand Rapids*, 66 N.W. 594, 596 (Mich. 1896).

The housing commission, a municipal corporation, has statutorily "enumerated powers and duties" that include, inter alia, the powers:

> (a) To determine in what areas of the city . . . it is necessary to provide proper sanitary housing facilities for families of low income and for the elimination of housing conditions which are detrimental to the public peace, health, safety, morals, and/or welfare;
>
> (b) To purchase, . . . own, hold, clear and improve property; to engage in or to contract for the design and construction, reconstruction, alteration, improvement, extension, and/or repair of any housing project or projects or parts thereof; to lease and/or operate any housing project or projects; . . .
>
> (g) [And] such other powers relating to said housing facilities project . . . as may be necessary to carry out the purposes of this act.

Mich. Comp. Laws § 125.6(a), (b), (g).

Here, the housing commission is "seeking to enjoin the construction of a prisoner facility, 60 feet from its residential property slated for future development as a residential neighborhood." Pl.'s Mot.  This action is an express exercise of its statutory power to "own, hold, clear and improve property" in order "to provide proper sanitary housing facilities for families of low income" while simultaneously "seeking the elimination of housing conditions which are detrimental to the public peace, health, safety, morals, and/or welfare."  Mich. Comp. Laws § 125.6(a), (b).  Reasonable minds may disagree with the wisdom of the public granting the broad mandate to a public corporation to develop properties "seeking the elimination of housing conditions which are detrimental to the public peace, health, safety, morals, and/or welfare."  *Id*.  Reasonable minds should agree, however, that as this mandate has been granted, the housing commission's actions were not ultra vires.

-28-

Bannum operates a halfway house across the street from the housing commission's planned community. This halfway house is for federal prison inmates nearing release from custody and criminal defendants sentenced to serve a period of time at the facility. Staff members do not attempt to stop the convicted criminals departing the premises without permission. The housing commission could reasonably conclude that this operation would pose a threat to its future residents' "peace, health, safety, morals, and/or welfare." *Id*. It was acting within its authority in seeking to enjoin Bannum's operations. The housing commission is entitled to judgment on Bannum's ultra vires claim.

## V

Accordingly, it is **ORDERED** that Defendant's motion to dismiss the complaint (ECF No. 56) is **GRANTED**.

It is further **ORDERED** that Plaintiff's motion to dismiss the counterclaim (ECF No. 59) is **GRANTED**.

It is further **ORDERED** that hearing scheduled for Monday, January 30, 2012, at 3:00 p.m is **CANCELED** because the parties' papers provide the necessary factual and legal information to decide the motion. *See* E.D. Mich. L.R. 7.1(f)(2).


Dated: February 3, 2012

                                             s/Thomas L. Ludington
                                             THOMAS L. LUDINGTON
                                             United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 3, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS